



U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 3, 2008**                                    **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE:                          §
                                §
TRUESTAR BARNETT, LLC a/k/a     §      CASE NO. 07-34192-SGJ-11
TRINITY BARNETT, LLC,           §
                                §
        DEBTOR.                 §


### <u>MEMORANDUM OF DECISION REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT</u>

Before this court are cross motions for summary judgment [DE ## 433, 451, and 454] in a contested matter involving whether the Debtor, TrueStar Barnett, LLC (hereinafter, the "Debtor"), is obligated, in connection with its assumption and assignment of various executory contracts with Eagle Oil & Gas Co. (hereinafter, "Eagle"), to pay Eagle $1.6 million, in order to comply with the requirement in Bankruptcy Code Section

1

365(b)(1)(A) that a debtor must cure any defaults[1] in connection with assuming an executory contract. The court has determined that there exists no genuine issue of any material fact with regard to whether the Debtor, as part of its assumption and assignment of the various executory contracts between it and Eagle, is required to pay the $1.6 million as a cure amount. The court determines, as a matter of law, that the $1.6 million obligation (as hereinafter further described), is not an obligation of the Debtor that it must cure or pay, in order to validly assume and assign its agreements with Eagle. The Debtor is granted both motions for summary judgment and Eagle's cross motion for partial summary judgment is denied.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A summary judgment motion is properly granted only when, viewing the evidence in the light most favorable to the nonmoving party, the record indicates that there is no genuine issue as to any material fact." *Am. Home Assurance Co. v. United Space Alliance, LLC,* 378 F.3d 482, 486 (5th Cir. 2004). The

---

[1] Except for certain types of defaults not relevant to this discussion.

2

materiality of facts is governed by substantive law, and only facts that might affect the outcome of the suit will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must review the factual and legal issues presented in order to make a determination on the summary judgment motion, and must view those facts in the light most favorable to the nonmoving party.

## UNDISPUTED FACTS

The undisputed, material facts are that:

1. The Debtor, during this bankruptcy case, moved and was granted permission, under Section 365 of the Bankruptcy Code, to assume and assign to Global Energy Ventures, L.P. (hereinafter, "GEV") certain agreements with Eagle (hereinafter, the "Eagle Agreements"). GEV had purchased substantially all of the Debtor's assets in a Section 363 court-approved sale. The assets that were purchased by GEV from Debtor were mostly mineral leases in the Barnett Shale in Texas. The Debtor and its non-debtor parent had purchased these mineral leases from Eagle approximately three years before the Debtor went into bankruptcy. Eagle had continued to operate these mineral properties under various joint operating agreements (hereinafter, the "JOAs") that remained in place as of the bankruptcy filing.

2. The Eagle Agreements that were the subject of the Debtor's Section 365 motion were: (a) an Amended and Restated

3

Purchase and Sale Agreement, dated June 21, 2004, between Eagle, as seller, and Trinity Plumas Capital Corp. and Trinity Barnett LLC, as buyers (hereinafter, the "PSA"); (b) the Second Amended and Restated Operations Extension Agreement, dated February 25, 2005, between Eagle and Trinity Barnett, LLC  (hereinafter, the "Second Operations Agreement"); and (c) the various JOAs, involving the mineral properties that were the subject of the PSA and Second Operations Agreement.

3.   Trinity Plumas Capital Corp. is now known as TrueStar Petroleum Corporation and is the Debtor's non-debtor parent (hereinafter, the "Non-Debtor Parent").  Trinity Barnett LLC is another name used by **TrueStar** Barnett, LLC (*i.e.,* the "Debtor").

4.   The Debtor and Eagle initially negotiated a stipulation, in connection with the Debtor's assumption and assignment of the Eagle Agreements, that was approved by this court, in which they agreed:  (a) that the Debtor would promptly pay Eagle certain *undisputed* cure amounts in connection with the Debtor's assumption and assignment of the Eagle Agreements; (b) the Debtor would escrow certain funds for possible additional cure amounts owing to Eagle; and (c) the parties would ask the bankruptcy court to adjudicate whether an additional cure amount was owing to Eagle, if the parties could not otherwise agree.

5. The question of what additional cure amount might be owing to Eagle by the Debtor is now before the court in these

4

cross motions for summary judgment.  Eagle asserts that the Debtor owes an additional $1.6 million cure payment, and the Debtor wholly disputes this.  The parties refer to this $1.6 million disputed amount as the "Section 3.1(a) Balance" because it is described in Section 3.1(a) of the PSA that the Debtor assumed and assigned.  The Debtor argues that the Section 3.1(a) Balance was an obligation solely of its Non-Debtor Parent (and that such obligation, by the way, has been discharged by the Non-Debtor Parent).  The question primarily before the court in these cross-motions for summary judgment is whether the Section 3.1(a) Balance was or was not ever an obligation of the Debtor that must be cured in order for the Debtor to have validly assumed and assigned the Eagle Agreements.  The issue of whether the Non-Debtor Parent may have already paid the Section 3.1(a) Balance is **not** now before the court.

### APPLICABLE LEGAL AUTHORITY

6.   Before delving into the specific language of the PSA, the court starts with a recitation of basic black letter law regarding how courts should approach contract interpretation and disputes.

7.   Texas law and applicable federal law are the law that govern construction of the PSA pursuant to Section 18.11 of the PSA.

8.   One of the most-often cited decisions dealing with

contract interpretation in Texas is *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983). It instructs that:

> In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex. 1980); *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex. 1968). To achieve this objective, courts should examine and consider the *entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless. *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 158 (1951). No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Myers v. Gulf Coast Minerals Management Corp.,* 361 S.W.2d 193, 196 (Tex. 1962); *Citizens Nat'l Bank in Abilene v. Texas & P. Ry. Co.,* 136 Tex. 333, 150 S.W.2d 1003, 1006 (1941).

*Coker*, 650 S.W.2d at 393 (emphasis in original).

9. In construing a contract and ascertaining the intent of the parties, black letter law further instructs that one does **not** look beyond the four corners of the document, unless there is ambiguity in such document. *C*oker elaborates that, "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Coker*, 650 S.W.2d at 394 (citing *R & P Enterprises*, 596 S.W.2d at 518). A contract should be interpreted to be ambiguous when "its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning." *Coker*, 650 S.W.2d at 393 (citing *Skelly Oil*

*Co. v. Archer*, 163 Tex. 336, 356 S.W.2d 774, 778 (1962)). "When a contract contains an ambiguity, the granting of a motion for summary judgment would be improper because the interpretation of the instrument becomes a fact issue and, at that point, the court should consider evidence beyond the four corners of the document." *Coker*, 650 S.W.2d at 394 (citing *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1980)). But if "the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker,* 650 S.W.2d at 393-394 (citing *Universal C.I.T. Credit Corp.,* 243 S.W.2d at 157; *R & P Enterprises,* 596 S.W.2d at 519).

10. Ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be *reasonable*. *Lopez v. Munoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 861 (Tex. 2000) (emphasis added and citations omitted).

11. Additionally, these basic contract principles set forth above apply even where multiple instruments are executed as part of the same transaction or agreement. "It is settled in Texas that where two or more instruments executed contemporaneously or at different times pertain to the same transaction, the instruments will be read together even though they do not expressly refer to each other." *Pendleton Green Assoc. v. Anchor*

7

*Sav. Bank*, 520 S.W.2d 576, 584 (Tex. Civ. App.–Corpus Christi, 1975, no writ). "This rule is applicable to instruments executed in connection with the same transaction when one or more of the instruments are promissory notes." *Id.*

12.  Finally, "contract terms are to be given their plain, ordinary, and generally accepted meanings and the more specific provisions of a contract will control over the general." *Ayres Welding Co., Inc. v. Conoco, Inc.*, 243 S.W.3d 177, 181 (Tex. App.–Houston [14th Dist.] 2007, rehearing overruled, pet. denied). *See also Pratt-Shaw v. Pilgrim's Pride Corp.,* 122 S.W.3d 825, 829 (Tex. App.–Dallas, 2003, no pet.) ("specific and exact" terms should be greater weight than general language).

## THE EAGLE AGREEMENTS ARE NOT AMBIGUOUS, AND DEBTOR IS ENTITLED TO SUMMARY JUDGMENTS AS A MATTER OF LAW

13.  Because the contract language in the Eagle Agreements can be given a definite legal meaning, and, in this court's view, is not *reasonably* susceptible to more than one meaning, the court has determined that the PSA and the instruments executed along therewith, as well as the Second Operations Agreement, are not ambiguous.  To reiterate, the agreements and their exhibits are worded in a way that they can be given a certain and definite legal meaning.  When harmonizing their various provisions, the court can construe them, as a matter of law, to mean that only the Non-Debtor Parent had liability for the Section 3.1(a) Balance.

## A. The Section 3.1(a) Balance Was Not an Obligation of the Debtor Pursuant to the Terms of the PSA

14. First, construing the terms of the PSA in their entirety, the Section 3.1(a) Balance is merely an obligation of the Non-Debtor Parent.

15. The most relevant portions of the PSA are: the Introduction paragraph; Article 2; Article 3 (and the Exhibit E referenced therein); Article 5; Article 11; Article 16; and Article 18.

16. <u>Introduction and Article 2.</u> First, in the Introduction paragraph of the PSA, "Buyer" is defined as two distinct entities, Trinity Plumas Capital Corporation (*i.e.,* the Non-Debtor Parent) and Trinity Barnett, LLC (*i.e.,* the Debtor). And they, as joint buyer, in Article 2 of the PSA, agreed to purchase from, and pay Eagle for, the Assets. Also, in Article 2, Seller, Eagle, agreed to sell and convey the Assets to Buyer "subject to the terms and conditions of this Agreement." One of the "terms" of the PSA is in Article 3, entitled "Purchase Price and Payment," wherein lies the subject of this inquiry regarding the Section 3.1(a) Balance.

17. <u>Article 3 (and Exhibit E referenced therein).</u> Article 3 of the PSA instructed "Buyer" what and how to pay "Seller" for the "Assets."

(b) Article 3. – Purchase Price and Payment

"3.1. <u>Purchase Price</u>. The Purchase Price shall be comprised of the following components.

    a. Subject to adjustments as set forth below, the Purchase Price for the Assets described in Section 1.3a. through 1.3d., inclusive, shall be FIFTEEN MILLION, SEVEN HUNDRED FOUR THOUSAND, FIVE HUNDRED SIXTY-FIVE Dollars and THIRTEEN CENTS ($15,704,565.13), comprised of FOURTEEN MILLION, ONE HUNDRED FOUR THOUSAND, FIVE HUNDRED SIXTY-FIVE Dollars and THIRTEEN CENTS ($14,104,565.13) payable in cash and a Promissory Note in the principal amount of ONE MILLION, SIX HUNDRED THOUSAND Dollars ($1,600,000.00), allocated among the Assets as provided in Exhibit G. The form of the Promissory Note is Exhibit E.

    b. The Purchase Price for the assets described in Section 1.3e. and 1.3f. shall be TWO MILLION, EIGHT HUNDRED THIRTY FOUR THOUSAND SIX HUNDRED Dollars ($2,834,600.00), payable in thirty-six (36) equal monthly installments of SEVENTY-EIGHT THOUSAND SEVEN HUNDRED THIRTY-EIGHT Dollars and EIGHTY-NINE Cents ($78,738.89) each, the first of which shall be payable no later than sixty (60) days after Closing with the remaining installments due and payable on the first day of each succeeding month thereafter until fully paid."

18. It is undisputed that Section 3.1(a) set forth a $15,704,565.13 Purchase Price for certain assets covered by the PSA and Section 3.1(b) set forth another $2,834,600 Purchase Price for certain other, distinct assets covered by the PSA. No

10

other provision of the PSA set forth the precise terms of the Purchase Price to be paid for the Assets. Nowhere else in the contract was there found the aggregate sum to be paid to Eagle, but in Article 3. To the extent that the Non-Debtor Parent and Debtor were obligated by Article 2, or elsewhere under the PSA, to pay Eagle for the Assets, *the specifics of that obligation to pay were set forth in Article 3*.

Eagle admits that the cash component of $14,104,565.13, payable under Section 3.1(a) of the PSA, has been paid. Similarly, Eagle admits that the Section 3.1(b) payments owing have now been paid to Eagle. All that remains unpaid (according to Eagle)[2] is the $1.6 million obligation described in Section 3.1(a), to be payable in the form of the Exhibit E Promissory Note.

19. Eagle argues that the Debtor and the Non-Debtor Parent are jointly and severally liable for this obligation. The court determines that this is an unreasonable construction. Exhibit E, which was attached to and made a part of the PSA, was a form of convertible promissory note, with only the Non-Debtor Parent as a maker, and there is no reference to the Debtor as a co-maker or a guarantor. Guaranty liability, under Texas law, cannot be

---

[2]Eagle also asserts certain attorney's fees are owing to it. Such fees are not the subject of the cross motions for summary judgment.

11

inferred; rather, in order for a guaranty to be enforceable "it must, with reasonable clearness, evidence an intent on the part of a party to become liable on an obligation in the event of a default by the primary obligor." *Texas Commerce Bank Nat'l Assoc. v. Capital Bancshares, Inc.*, 907 F.2d 1571, 1574 (5th Cir. 1990). A guarantor's liability cannot be extended or created through implication or construction. *Id.* (citing *Coker*, 650 S.W.2d at 394 n.1). Moreover, the black letter contract principle that general contract provisions give way to more specific terms is germane here, and precludes the interpretation of the PSA advanced by Eagle. Simply because Article 2 generally describes the Debtor as a Buyer cannot be reasonably interpreted to mean that the Debtor is liable on the convertible promissory note (or the indebtedness represented thereby) when the specific language of Exhibit E dictates otherwise. *See Ayres Welding Co., Inc. v. Conoco, Inc.*, 243 S.W.3d 177, 181 (Tex. App. – Houston [14[th] Dist.] 2007, rehearing overruled, pet. denied) ("[C]ontract terms are to be given their plain, ordinary, and generally accepted meanings and the more specific provisions of a contract will control over the general."); *Pratt-Shaw v. Pilgrim's Pride Corp.*, 122 S.W.3d 825, 829 (Tex. App.–Dallas, 2003, no pet.) ("specific and exact" terms should be given greater weight than general language).

　　20. <u>Article 5</u>. Next, Article 5 of the PSA is entitled

"Buyer's Representations and Warranties," and, therein, the PSA contained various representations and warranties by Buyer. All of these representations and warranties dealt with the Buyer's corporate good-standing status and authority to enter into the Eagle Agreements and ancillary documents, as well as a representation that the Buyer was not in bankruptcy nor a receivership, that it did not owe any broker fees, and that it had consulted with its own advisors. These representations and warranties are relevant mainly for what is *not* stated, rather than what *is* stated: Specifically, there are no representations or warranties regarding any obligation of the Debtor in connection with the Promissory Note that was simultaneously being executed by the Non-Debtor Parent.

21. <u>Article 11.</u> - Next, Article 11 of the PSA is entitled "Covenants of Seller - Operations." Therein, the PSA contained various covenants by the Seller. Notably, there is no companion provision containing covenants or promises by the Buyer. There was no covenant in the PSA by the Debtor to execute the Promissory Note, to be bound by the Promissory Note, to guaranty the note, or to otherwise pay the amount represented by the note in the event it was not paid by the Non-Debtor Parent. Given that the Debtor was not a maker on the Promissory Note or any other loan document, clearly Article 11—dealing with covenants—would have been a logical place to set forth a covenant

13

of the Debtor to pay the amount set forth in the Promissory Note, if it was the intention or the parties to obligate the Debtor in this way.

22. <u>Article 16.</u> - Next, Article 16 of the PSA is entitled, "Default and Remedies." Therein, Section 16.1 defined the Seller's remedies, (a) in the event that the Buyer did not comply with the PSA by the Closing Date (*i.e.,* in such event, Seller would "retain the Performance Deposit as a liquidated damage . . . as Seller's sole and exclusive remedy for such default"); or (b) in the event that the Buyer did not close under the PSA for reasons other than the Seller's refusal to close (*i.e.,* in such event, Seller could "retain all of the Performance Deposit"). Additionally, Section 16.3 contained a preservation of certain Confidentiality Agreements between the parties (that are referenced in Section 6.3 of the PSA) in the event there was a termination of the PSA. Finally, Section 16.3 provided for the prevailing party to recover court costs and reasonable attorney's fees from the non-prevailing party in any legal proceeding to enforce the PSA. There were no other stated remedies in the PSA. For example, there were no stated remedies for the scenario of a possible breach of the PSA post-closing. And significantly, there was no defined remedy or recourse against the Debtor in the event that the Non-Debtor Parent failed to satisfy its obligations under the Convertible Promissory Note.

23.    Article 18.    Last but not least, Article 18 of the
PSA, entitled "Miscellaneous," is relevant.    Section 18.8
indicated that only the Debtor would be an assignee of the assets
under the Bill of Sale to be delivered at closing (a form of
which was attached as Exhibit C to the PSA).    This would seem to
be yet another indication that the use of the word "Buyer" to
define both the Debtor and Non-Debtor Parent in the Introduction
of the PSA did not necessarily mean that all provisions of the
PSA applied to both the Debtor and Non-Debtor Parent.    Next,
Section 18.12 appears to be a classic contract integration
clause.    It provided that the PSA "embodies the entire agreement
between the Parties and replaces and supersedes all prior
agreements, arrangements and understandings related to the
subject matter hereof, whether written or oral.    ***    This
Agreement may be supplemented, altered, amended, modified or
revoked by writing only, signed by the Parties hereto."    This, of
course, indicated an intention of the parties that parol evidence
should not be consulted to vary the terms of the PSA.    Finally,
Section 18.13 went on to incorporate the various exhibits to the
PSA, such as the Exhibit E Promissory Note, as part of the
overall contract:    "All Exhibits and Schedules attached to this
Agreement, and the terms of those Exhibits which are referred to
in this Agreement, are made a part hereof and incorporated herein
by reference."

In summary, the court, in construing all of the provisions of the PSA and the Exhibits thereto, has determined that there exists no genuine issue of material fact with regard to whether the Debtor, as part of its assumption and assignment of the PSA, is required to pay the Section 3.1(a) Balance in order to "cure" any defaults under the PSA, pursuant to Section 365(b)(1)(A). This determination is consistent with the black letter rule of contract construction providing that effect must be given to all parts of a contract. *See Coker*, 650 S.W.2d at 393 ("[C]ourts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless.") (emphasis in original). Any other interpretation of the PSA is unworkable when applying both the terms of the PSA and general rules of contract construction. The court determines, as a matter of law, that the Section 3.1(a) Balance, is not an obligation of the Debtor under the PSA, but rather of the Non-Debtor Parent, pursuant to the separate and incorporated Exhibit E Promissory Note. The Debtor is granted Summary Judgment on its first Motion [DE # 433] and Eagle's "Cross Motion for Partial Summary Judgment" is denied with regard to whether the Debtor is obligated for the $1.6 million Section 3.1(a) Balance under the PSA.

**B.   The Section 3.1(a) Balance Was Not Made an Obligation of the Debtor Pursuant to the Terms of the Second Operations Agreement**

24.   The next argument (which is addressed in the Debtor's Second Motion for Summary Judgment, DE #454) can be swiftly disposed of.   Eagle argues, in essence, that even if the Section 3.1(a) Balance was not an obligation of the Debtor pursuant to the PSA, it was made an obligation of the Debtor in the later-executed Second Operations Agreement between Eagle and the Debtor.

25.   The Second Operations Agreement was entered into on February 25, 2005—several months after the PSA was executed. The Second Operations Agreement modified an original Operations Extension Agreement and an Amended and Restated Operations Extension Agreement, all of which were between Eagle and the Debtor and dealt with Eagle's operation of the mineral properties that the Debtor and Non-Debtor Parent agreed to buy from Eagle.

26.   The Second Operations Agreement, among other things, addressed certain new properties that were acquired and would be operated on the Debtor's behalf by Eagle.   The language primarily relied upon by Eagle in the Second Operations Agreement is found at Section 15 therein, dealing with the term of the Second Operations Agreement and specifically the circumstances under which Eagle could be terminated as the operator of the mineral properties.   In Section 15, the parties agreed that the Second Operations Agreement "shall not terminate without the Operator's

17

express, written consent before Company has paid Operator all principal and interest under the Bridge Note, all other amounts due hereunder, and all amounts due under the PSA . . ." Eagle argues that this meant that Eagle could not be terminated as operator until the Debtor had paid Eagle all amounts due to Eagle under the PSA. In other words, this is an acknowledgment or agreement that Debtor was or was making itself obligated on all of the obligations addressed in the PSA.

27. The court cannot make the leap that Eagle wants it to make and determine that the Debtor agreed, in Section 15 (or any other part of the Second Operations Agreement), to pay Eagle all amounts due under the PSA—even amounts on which only the Non-Debtor Parent was originally liable.

28. Because the contract language in the Second Operations Agreement can be given a definite legal meaning, and, in this court's view, is not *reasonably* susceptible to more than one meaning, the court has determined that the Second Operations Agreement is not ambiguous. The Second Operations Agreement is worded in a way that it can be given a certain and definite legal meaning. When considering the entire agreement, and harmonizing its various provisions, the court can construe it, as a matter of law, to mean that no additional obligation was imposed upon the Debtor for the Section 3.1(a) Balance. The court sees nothing ambiguous in the Second Operations Agreement that requires the

court to consider evidence beyond the four corners of the document.

29. Among other things, the court agrees with the Debtor's argument that Paragraph 15 of the Second Operations Agreement reflects an express bias towards specifically listing the obligations covered—including the specific references to the obligation under paragraph 12 of the Second Operations Agreement (following a general reference to all the amounts due under the Second Operations Agreement) and to the principal and interest due on the Bridge Note. The failure to include any reference to the Convertible Promissory Note, even though it is a defined term in the Second Operations Agreement, is inconsistent with this drafting technique and is evidence that Debtor did not intend to obligate itself for the Convertible Promissory Note.

30. But once again, the court falls back to the authority cited earlier that guarantees are not to be implied. Rather, in order for a guaranty to be enforceable "it must, with reasonable clearness, evidence an intent on the part of a party to become liable on an obligation in the event of a default by the primary obligor." *Texas Commerce Bank Nat'l Assoc. v. Capital Bancshares, Inc.*, 907 F.2d 1571, 1574 (5th Cir. 1990). Simply because Section 15 of the Second Operations Agreement generally references that the Debtor cannot terminate Eagle as operator until it has paid it "all amounts due under the PSA" cannot be

reasonably interpreted to mean that the Debtor suddenly agreed to be impliedly liable on the convertible promissory note (or the indebtedness represented thereby) when the specific language of Exhibit E attached to the PSA specifically dictated otherwise. *See Ayres Welding Co., Inc. v. Conoco, Inc.*, 243 S.W.3d at 181. *Pratt-Shaw v. Pilgrim's Pride Corp.*, 122 S.W.3d at 830. The court construes Section 15 simply to mean that Debtor was agreeing to pay any amounts *Debtor* owed Eagle under the PSA.

**C.  Eagle's Argument that the Debtor is Obligated for the Section 3.1(a) Balance Under a Reverse Piercing the Veil/Alter Ego Type Theory Does Not Prevent Summary Judgment in Favor of the Debtor**

31.  Lastly, the court must address Eagle's argument that the Debtor, even if not liable as a matter of contract, for the Section 3.1(a) Balance, may be liable under a reverse veil piercing type theory, for the obligations of its parent and, thus, summary judgment in favor of the Debtor is not proper—as there are genuine issues of disputed facts on this point. The court determines that, as a matter of law, Eagle cannot use this alter ego type argument as a method of imposing extra Section 365 cure obligations upon the Debtor.

32.  Section 365 does not give the right to the counterparty to an executory contract that is being assumed to demand, as part of a cure of defaults, to payment of extra-contractual claims (*i.e.,* claims that may be asserted against the Debtor that have nothing to do with any default of the Debtor under the executory

contract). Here, this is precisely what we have. Even giving Eagle every benefit of the doubt, as the court is required to do in a summary judgment context—in other words, even assuming that Eagle has standing to assert an alter ego type claim against the Debtor, and even assuming that the Texas Business Corporations Act does not preclude Eagle from asserting alter ego liability against the Debtor where no fraud has been pled—the fact is that such a theory of liability would simply be a way of imposing liability upon the Debtor for an obligation of the Non-Debtor Parent (*i.e.*, the Promissory Note obligation). This is not the same thing as a cure obligation of the Debtor in connection with the PSA. At most, Eagle would have a distinct claim against the Debtor for the obligation of the Non-Debtor Parent under the Promissory Note that allegedly has not been satisfied and for which the Debtor (under alter ego theories) might also be on the hook. But this is not the same thing as a cure obligation of the Debtor as contemplated by Section 365(b).

33. Eagle relies on the *Carterhouse* case as supportive of its arguments on this point but the court believes *Carterhouse* is not analogous to the TrueStar/Eagle dispute. *See In re Carterhouse, Inc.*, 94 B.R. 271 (Bankr. D. Conn. 1988). In *Carterhouse*, there was a debtor-obligation at issue (*i.e.*, an executory contract between the debtor and NAVL, in which the debtor was obligated not to compete with NAVL). NAVL argued that

the debtor had breached the non-compete provisions of the executory contract between them, by creating a debtor-affiliate that was, in fact, competing with NAVL. It was argued that the debtor-affiliate was the alter ego of debtor and, thus, the debtor-affiliate's breach should be deemed the debtor's breach, and this breach could not be cured and, thus, the executory contract could not be assumed.

34. The fact situation in *Carterhouse* is different from the TrueStar/Eagle situation, where the argument revolves around a *non-debtor* obligation in the executory contract. In the case at bar, it is the *Non-Debtor Parent's* obligation to extinguish the Promissory Note that has allegedly been breached—and Eagle is trying to make the Debtor responsible for that breach through the alter ego argument. This is the opposite situation as was present in *Carterhouse,* and it is a distinction that is relevant. Unlike in *Carterhouse*, Eagle is trying to make the Debtor liable for an obligation that was not its own contractually.

35. The TrueStar/Eagle situation is more analogous to the cases where a counterparty to an executory contract was trying to have cured, or paid as part of an assumption, claims or damages that were distinct from the Debtor's obligations under the executory contract—or "extra contractual" remedies as the TrueStar's counsel has called it. *See In re F&N Acquisition Corp.*, 152 B.R. 304, 306-307 (Bankr. W.D. Wash. 1993) (denying

22

creditor's request for extra-contractual damages as cure amounts under Section 365(b)(1)(B) where such damages were not expressly provided for in a lease agreement assumed by the debtor); *In re Joshua Slocum, Ltd.*, 103 B.R. 601, 605-607 (Bankr. E.D. Pa. 1989) (disallowing a contract party's claims for attorney's fees and common area charges where such damages were not provided for in the contract assumed).  The court has not found much case law that is terribly analogous to what Eagle is trying to do here. However, the court believes that section 365 cannot possibly require a debtor, in connection with assumption, to cure anything other than its own defaults under the contract being assumed. Any other claims or theories of damages asserted against the Debtor are wholly distinct from the section 365 analysis.

36.  In summary, if Eagle believes that the Non-Debtor Parent is the alter ego of the Debtor, and therefore the Debtor should be deemed liable for its liabilities (including the Promissory Note), then this may be brought in a separate action in this case—but such theories have no application in this section 365 dispute and presumably any such liability on the part of the Debtor would be a mere unsecured claim.

## CONCLUSION

In conclusion the Debtor's two Motions for Summary Judgment are **GRANTED**, and Eagle's Motion for Summary Judgment is **DENIED**.

###END OF MEMORANDUM OF DECISION###